UNITED STATES BANKRUPTCY COURT

IN AND FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| RFI REALTY, INC., et al., | In Chapter 11 proceedings |
| | Case No. 02-04-bk-10486-CGC |
| Debtor. | MEMORANDUM DECISION RE: MOTION TO ASSUME DEVELOPMENT AGREEMENT WITH CITY OF SANTA CLARITA |
| | (Opinion to Post) |

## I. INTRODUCTION

### A. Procedural Background

The Debtors, RFI Realty, Inc. ("Realty"), Remediation Financial, Inc. ("RFI"), Santa Clarita, L.L.C. ("SCLLC"), and Bermite Recovery, L.L.C. ("Bermite") (collectively referred to hereinafter as "Debtors"), have moved to assume the "Development Agreement by and between the City of Santa Clarita and Whittaker Porta Bella Development, Inc." (the "Development Agreement"). The City of Santa Clarita ("the City") objects, and Whittaker Corporation ("Whittaker") has filed a statement of position raising a number of objections. The matter was argued on May 12, 2005, at which time it was taken under advisement.

### B. Overview

Certain of the Debtors own approximately 1000 acres of contaminated and largely undeveloped property in the heart of Santa Clarita, California. The property was used to manufacture a variety of munitions and explosives beginning in 1934. Whittaker owned and operated the site from the late 1960's until the late 1980's. All parties agree that the decades of explosive manufacturing led to the site's current state of contamination. When the manufacturing ceased, but the contamination remained, the City and various proposed developers began the long and difficult task of putting together a development plan for the property. The concept that emerged was for a master planned community to be known as "Porta Bella," with nearly 3000 homes, millions of square feet of commercial space, and public spaces, including parks and schools.

This effort culminated in March of 1996 when the City and a subsidiary of Whittaker, known as Whittaker Porta Bella Development, Inc. ("WPBD"), entered into the Development Agreement at issue here. The Development Agreement sets forth the obligations of the parties and the entitlements of the land. The Development Agreement was formally approved by the City through the adoption of Ordinance No. 96-4.

The Development Agreement is subject to a number of "project approvals." These include the "Specific Plan," a "Vesting Map," the "Final Conditions of Approval," the Oak Tree Permit 91-033, the certification of the Environmental Impact Report ("EIR"), the adoption of the Mitigation Monitoring and Reporting Plan, the Statement of Overriding Considerations, and the Amendments to General Plan (Ordinance No. 95-06).

Of particular importance to the pending Motion to Assume are the Final Conditions that were approved by Resolution No. 95-42. The Final Conditions cover a wide variety of matters and are identified by the first two initials of the department of city government responsible for them or the subject matter involved. For example, the thirty-two "DS" conditions relate to the Development Services division of the Community Development Department. Likewise, there are "TE" conditions for Traffic Engineering, "ED" conditions for the Engineering Division, "OT" conditions relating to the existence of oak trees on the property, "TR" conditions relating to Transit, "FD" conditions relating to the Fire Department, and "PR" conditions relating to Parks and Recreation.

All of this occurred well before the Debtors had any interest in the subject property. In January, 1999 (pursuant to a purchase agreement dated as of November 5, 1998), SCLLC purchased 996 acres from WPBD. In March, 2000, Bermite acquired title to approximately 23 acres adjacent to the SCLLC parcel. Pursuant to one of the purchase documents (the "Assumption and Assignment Agreement"), Debtors agreed to assume, discharge and perform all of WPBD and Whittaker's rights and obligations under the Development Agreement.[1]

---

[1] Debtors strenuously argue that the Assumption and Assignment Agreement is not executory but fail to explain why that is important. If it is not an executory contract, then it is binding on Debtors without the need, or even the ability, to assume it. But, certainly, it is binding

2

The Debtors purchased the property knowing it to be contaminated; indeed, the purchase, remediation, development, and sale of once contaminated property is stated to be Debtors' primary business. However, there is no dispute that Debtors did little remediation and undertook no development after purchasing the property. This led to involvement of the California Department of Toxic Substances Control ("DTSC"). As a result, in February of 2001, SCLLC entered into a 48 page Enforceable Agreement with DTSC. This agreement detailed SCLLC's obligations to remediate the property. By January of 2002, the California attorney general notified SCLLC that it was in default of its obligations under the DTSC agreement.

At this point, DTSC turned to Whittaker who, as a prior owner, was required to step back in and resume remediation. This remediation activity has continued to the present. Whittaker has filed a substantial administrative claim for its costs of remediation.[2]

## II. THE POSITIONS OF THE PARTIES

### A. Debtors

The Debtors have filed a motion to sell the property that is scheduled for hearing, after a detailed and lengthy auction process, on September 12, 2005. Among the assets to be sold are the Debtors' rights under the Development Agreement. Nonetheless, Debtors seek to assume the Development Agreement now without identifying the ultimate assignee. Debtors argue that this is appropriate to establish for the bidders that they will be able to succeed to the benefits of the Development Agreement. They further argue that there are no defaults under the Development Agreement; therefore, they need not show adequate assurance of future performance. They further argue that they are entitled to assume the Development Agreement free of certain "burdens," in particular the terms of a settlement by the City of the so-called PERC litigation which, Debtors argue, unreasonably prejudices the Debtors by limiting the City's options for environmental compliance.

### B. The City

---

nonetheless.

[2]Whittaker is the insured under a policy with ZC Specialities pursuant to which it is reimbursed for 90% of its out of pocket remediation costs.

1 | The City argues that it is premature for the Debtors to assume the Development Agreement outside of the context of an assignment to the eventual buyer. It asserts that the Development Agreement is in default, referencing in particular a resolution passed by the City Council in 2003. In that resolution, two specific items were set out: 1) failure to name the City as an additional insured under certain insurance policies; and 2) the breach by the Debtor of its obligations under the DTSC Enforceable Agreement. Further, the City insists that the Debtors comply with DS-12, a condition that the Debtors accept; however, both parties read the obligations imposed by DS-12 differently.

C. Whittaker

Whittaker argues that Debtors are bound by all the obligations in the Development Agreement and related documents, including the obligation to clean up the whole site before construction may begin (DS-12) and the obligation to indemnify the City for all contamination related risks and damages.

III. DISCUSSION AND ANALYSIS

A. Issues to be decided

Boiled to its essence, this motion presents two issues:

1. Whether the Development Agreement can, or should, be presently assumed by the Debtors without assignment to a third party purchaser? This issue implicates whether there are defaults under the Development Agreement (the existence of which would obligate the Debtors under 11 U.S.C. section 365(b)(1) to cure such defaults, compensate the City for any damages caused by the default and demonstrate adequate assurance of future performance) and whether the applicable standard for assumption is the Debtors' "business judgment." Specifically, this issue raises the question whether the Debtors' default under the DTSC Enforceable Agreement is a default under the Development Agreement and whether the other alleged default, the failure of Debtors to name the City as an insured under Debtors' insurance policy with Steadfast, precludes assumption.

2. Whether the PERC settlement inappropriately "burdens" Debtors' rights under the Development Agreement by limiting the available methods for the City to grant approvals required under DS-12?

B. Assumption without assignment

Debtors are quite correct that it is not necessary for them to have an assignee in pocket in order

4

to assume the Development Agreement at this point. And, if there are no defaults, then neither cure nor adequate assurance would be necessary. But, of course, Section 365(a) makes any such assumption subject to approval by the Court and that decision requires a determination that an assumption is in the best interests of the estate and that, in turn, requires an analysis of the nature of the Development Agreement itself.

The first issue is whether there are defaults. Debtors argue that the City has consistently and publicly stated that the Development Agreement is in full force and effect and that no formal declarations of default have been issued. This misses the point. First, many agreements remain "in full force and effect" where defaults exist; this situation is explicitly recognized by Section 365's requirement that defaults must be cured for an executory contract to be assumed. Thus, while a termination of the contract may prevent assumption, a default does not. No one is suggesting that the Development Agreement has been terminated. Second, the parties have executed tolling agreements that explicitly prevent the formal declaration of a default.

Here, the City performed, as the Development Agreement permitted it to do, a review of the Debtors' performance under the Development Agreement and determined two things: first, that the Debtors were not in compliance with DTSC's Enforceable Agreement and, second, that Debtors had failed to name the City as an additional insured on its Steadfast policy. Are these defaults that need to be cured?

Baldly put, the Debtors view the Development Agreement as a bundle of rights with few, if any obligations. They point out that there is no development timetable and suggest that there may be no obligation to develop at all. This is best illustrated by Debtors' view of DS-12. That final condition states:

> For the entire 996 acres site, the applicant and/or future developer shall provide evidence, to the satisfaction of the City, of proper hazardous waste identification and remediation, from California Environmental Protection Agency/Department of Toxic Substances Control prior to the issuance of any grading permits. Until such evidence has been received, no construction may commence on the entire site until it is cleared by Cal EPA/DTSC.

In Debtors' view, DS-12 imposes no current remediation obligation upon them because they have not commenced construction on the site. And, Debtors posit, because there is no deadline by which construction must begin (other than the outside date for termination which is 2021), DS-12 will kick in only when, and if, Debtors or their assignee undertakes to develop the project.

This of course clashes with the reality of the DTSC's Enforceable Agreement and the Debtors' default under it that, in turn, has led to the imposition on Whittaker of remediation obligations. The Debtors assert, and cite several public statements by representatives of the City to support their claim, that compliance with the DTSC Enforceable Agreement is not an obligation under the Development Agreement and that therefore non-compliance does not give rise to a default under the Development Agreement. This position also clashes with the reality that the whole point of the Debtors' bankruptcy proceedings is to sell the property to an entity that *will* develop it.

Even if Debtors are technically correct (i.e., there is no timetable and non-compliance with DTSC is not a default under the Development Agreement), it is a hollow victory. The question presented here is whether the Court should approve the present assumption of this Development Agreement without designation of an assignee. Frankly, it seems wholly inappropriate to this Court to do so. This is true for two reasons. First, once the Development Agreement is assumed, any breach would give rise to an administrative damage claim. The Debtors have not articulated why it would be in the best interests of the estates to create that potential burden instead of taking advantage of the release provisions of Section 365(k) where assignment is so clearly intended. Second, whether the Debtors are in default or not, the assignee will need to provide adequate assurance of future performance under Section 365(f)(2)(B).

Regardless of the Debtors' massaging of the fine print, it is clear that the essence of the Development Agreement is that the developer *will* develop the project, albeit on a timetable and in a way that makes sense in light of market conditions. Further, the developer is entitled to rely upon the bundle of rights set forth in the Development Agreement and related documents without the risk that changing political winds or public sentiment may strip away those benefits. One of the developer's specific obligations is to comply with the Specific Plan, which "seeks to restore a highly disturbed site to contemporary uses in contrast to its current status as vacated former industrial manufacturing site." Here, Debtors have made it clear that they have no intention of developing the site – the goal is to sell it. Thus, it would be counterproductive to spend too much time focusing on the Debtors' failures. The critical inquiry is whether the purchaser – whoever that may turn out to be – can demonstrate adequate assurance of future performance, and that determination is for the Court to make as part of the sales and assignment process.

To make this determination, the Court will consider at least the following:

1. The assignee's proposed timetable for remediation and proposed timetable for development.
2. The assignee's financial wherewithal, from its own resources or elsewhere (such as existing or future insurance policies held by it or others) to fully develop and remediate the site.

These are relevant considerations because even though the Development Agreement itself does not have a specified timetable, it does specifically contemplate development of the entire site within the term of the Development Agreement. To determine whether the proposed assignee has provided the necessary adequate assurance, a review of its approach to completing the project will be required.

The insurance issue is somewhat different. Under the Indemnification Agreement, the original developer, WPBD, had the obligation to provide indemnification agreements from itself and its parent, Whittaker, and to name the City as an insured under any environmental policy, if obtained. Debtors agree that they, and any successor, are required to indemnify the City against environmental liability[3] but argue that the obligation to name the City as an insured was specific to Whittaker. This does not make sense; under the Assumption Agreement, Debtors assumed all of Whittaker's obligations. This means that the Debtors have the obligation to have the City named as an insured if they obtained such a policy. Debtors did obtain such a policy from Steadfast which, to date, has refused to name the City, citing the ongoing coverage dispute.

This issue will have to be addressed at the time of assignment and sale. There is an inherent tension here – will the Debtors have to provide such an endorsement in order to "cure" the failure of having not previously done so, where under Bankruptcy law, the Debtors will be relieved of further liability under

---

[3]Much is made in the papers of the Debtors' alleged refusal to indemnify the City. This is a non-issue; Debtors have agreed they have that obligation but sought clarification that they were not obligated to obtain the signature of any Whittaker entity on an indemnification. There is no indication that the City is in fact requiring the Debtors to do so; therefore, the matter need not be addressed.

7

Section 363(k) but may be asserted to have continuing liability as a responsible party under CERCLA?[4] It is premature to address the question now in light of the Court's determination that assumption should only be considered in connection with assignment.[5]

B.  The PERC settlement and the meaning of DS-12

Debtors argue that they are entitled to assume the Development Agreement "free" of the City's settlement in the PERC litigation. This issue is not ripe and the Court will not adjudicate it. When, or if, the issue arises, the then parties to the Development Agreement will have whatever remedies may be available to them. If, for example, the then developer requests an approval from the City and concludes that the City's response to that request violates the Development Agreement, then the developer may proceed in accordance with its rights. The same is true of DS-12. Debtors say that they are not asking for a modification of DS-12 but rather are asking for an interpretation. However, a motion to assume is not the equivalent of a declaratory judgment action. A concrete case or controversy needs to exist for the Courts' jurisdiction to lie. What the Debtors are asking for now on both of these points is an advisory opinion on matters that have not yet arisen and that may well be outside the Court's jurisdiction. The Court declines to give it.[6]

IV. **CONCLUSION**

For the foregoing reasons, the Debtors' motion to assume the Development Agreement is denied

---

[4] The issue may well be moot if a proposed settlement of the various insurance coverage issues is finally reached and approved by the Court.

[5] Any assignee will have to name the City as insured if it obtains such a policy; in other words, it will succeed to the Debtors' obligations that the Debtors succeeded to as a result of the Assumption and Assignment Agreement.

[6] The Court is of the view that the appropriate approach for any concerned would-be buyer is to address the issue directly with the City in advance of the bidding and sale hearing.

8

without prejudice. Counsel for Debtors is to serve copies of this decision on all interested parties.

So ordered.

DATED: JUN 3 0 2005

CHARLES G. CASE II
UNITED STATES BANKRUPTCY JUDGE

Copy of the foregoing sent via facsimile and/or
mailed this _____ day of June, 2005, to:

C. Taylor Ashworth
Alisa Lacey
Christopher Graver
STINSON MORRISON HECKER LLP
North Central Avenue, Suite 2100
Phoenix, Arizona 85004-4584
Attorneys for Debtors

_____
Judicial Assistant